UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KEALA MONTGOMERY,

                      Plaintiff,

        -against-

CITY OF NEW YORK, NEW YORK POLICE DEPARTMENT, NEW YORK CITY ADMINISTRATION FOR HEALTH SERVICES, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

                      Defendant.

09 Civ. 6145 (RJH)

**MEMORANDUM OPINION AND ORDER**

---

Richard J. Holwell, U.S. District Judge:

       On May 20, 2009, Keala Montgomery ("Montgomery") filed suit in New York Supreme Court against the City of New York, the New York Police Department ("NYPD"), the New York City Administration for Children's Services ("ACS"), and the United States Department of Housing and Urban Development ("HUD"). Montgomery alleged that the defendants had wrongfully subjected her to harassment and unlawful arrest and detention and sought damages for those injuries. On July 8, 2009, HUD removed the action to this Court pursuant to 28 U.S.C. § 1442. Then it moved to dismiss the complaint for lack of any substantive allegation against HUD. In a submission dated June 1, 2010, and styled an "Amended Complaint," Montgomery requested permission to amend her complaint. The Court will treat that letter as a motion for leave to amend. For the reasons given below, HUD's motion to dismiss is granted and Montgomery's motion for leave to amend is denied.

1

**BACKGROUND**

Montgomery's complaint makes the following allegations, which, for purposes of this motion, are accepted as true. In March 2009, a woman who lived in Montgomery's building falsely reported Montgomery to the police for assaulting her. (Compl. ¶ 4.)[1] Montgomery was subsequently arrested "without due process" and "detained for over 5 hours at a holding cell." (*Id.*) Montgomery separately alleges that security guards at a "public facility" called the police for an "unknown reason," and that the NYPD "harassed" her by "look[ing] through [her] bags" and "interrogat[ing] [her] on the street." (*Id.*)[2] The complaint seeks ten million dollars in damages. (*Id.* ¶ 8.)

On July 8, 2009, HUD removed the action to this Court. It subsequently filed a motion to dismiss on the ground that the complaint did not make any substantive allegations against HUD. Plaintiff obtained an enlargement of time to file an opposition; on March 25, 2010, she submitted a document styled as "Opposing Motion: Plaintiff's Motion to Amend the Petition." That document did not attach a proposed amended complaint, and its only mention of HUD was the assertion that Montgomery "was a HUD transfer in Dec[ember] of 2005." HUD notified the Court that plaintiff's allegations remained deficient and that there was no need for it to file a reply brief.

On June 1, 2010, Montgomery submitted a letter titled "Amended Complaint." In the letter, Montgomery concedes that "[i]n the original complaint, there were not plausible factors stated . . . to prove HUD acted as a liability to the case." (June 1 Letter at 1.) She requested permission to amend her complaint "with relevant information that

---

[1] The same accuser also lodged an unspecified charge against Montgomery with ACS in March 2009. (Compl. ¶ 3.)
[2] The complaint suggests that a criminal action is ongoing against Montgomery. (Compl. ¶ 5.) It does not say why.

2

has plausible facts that will connect the facts to this case." (*Id.*) The June 1 letter, which was titled "Amended Complaint," apparently constitutes plaintiff's proposed amended complaint.

The June 1 letter alleges that the condition of Montgomery's apartment, which is located in a building privately managed by "Manhattan North Management," has deteriorated since 2005 despite Montgomery's repeated complaints. (*Id.* at 1–2.) Montgomery says she took the management company to court over its failure to address her complaints, after which the company "retaliated against her" in unspecified ways. (*Id.* at 2.) She describes having to break a window to get into her apartment tin December 2008 because her doorknob was broken, and complains that the building's property manager and ACS subsequently investigated whether she had left her child alone in her apartment. (*Id.*) The ACS investigation supposedly stemmed from a conspiracy between individuals from her building and management, the details of which Montgomery does not set forth. The June 1 letter also alleges that Montgomery was the target of false criminal charges and a false report that she was trying to commit suicide. (*Id.*)

The letter explains that HUD is a named defendant because the management company, Manhattan North Management ("MNM"), "is a subsidiary of HUD. . . . It is part of a Section 8 program that requires private landlords to rent apartments according to affordability of income." (*Id.* at 1.) Montgomery pays a rent subsidized by HUD; she says that, "[i]n addition, the landlords have to be compliant with building inspections that comply [with] the standards of HUD/federal government programs. This is why I am including them in my petition." (*Id.*)

**DISCUSSION**

On a Rule 12(b)(6) motion to dismiss, a court must accept the allegations of the complaint as true and draw all reasonable inferences in plaintiff's favor. *See Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 124 (2d Cir. 2009). Still, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Twombly* ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (May 18, 2009). Pro se submissions are entitled to "special solicitude," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006), and even after *Twombly* and *Iqbal* courts "remain obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). But even a pro se complaint must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949; *see Fuentes v. Tilles*, No. 09-2954, 2010 WL 1838702 (2d Cir. May 10, 2010) (quoting *Iqbal* and dismissing pro se complaint for failure to state a claim).

There is no question that the complaint as originally pled is deficient as against HUD. Its allegations do not implicate HUD or any person acting on behalf of HUD. *See Garcia v. Watts*, No. 08-7778, 2009 WL 2777085, at *13 (S.D.N.Y. Sept. 1, 2009) (Pitman, M.J.) ("Where, as here, a complainant names a defendant in the caption but the complaint contains no substantive allegation against the defendant, dismissal of the complaint is appropriate."). That much the plaintiff concedes in her June 1 letter. (*See*

4

June 1 Letter (acknowledging that the original complaint did not state "plausible factors" to prove HUD's liability).)

The Court, however, must still determine whether to grant Montgomery's motion for leave to amend her complaint in the manner proposed in her letter of June 1, 2010.[3] Motions for leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). Courts "are normally accommodating to motions for leave to amend *pro se* complaints, but may deny them when amendment would be futile." *Fulton v. Goord*, 591 F.3d 37, 45 (2d Cir. 2009) (internal citations and quotation marks omitted).

Amendment would be futile here. Montgomery's proposed amended complaint lodges claims against the company that manages her apartment building. But the only connections Montgomery draws between those claims and HUD are that: (1) MNM colluded or conspired with HUD; (2) MNM is a "subsidiary" or "agent" of HUD; and (3) HUD subsidizes Montgomery's rent in the building MNM manages. The first contention is easily disposed of. "Broad allegations of conspiracy are insufficient; the plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Arar v. Ashcroft*, 585 F.3d 559, 569 (2d Cir. 2009). That HUD subsidizes housing that MNM owns or manages provides no basis for finding that the two entities conspired together. And Montgomery offers no other explanation or detail about the purported conspiracy.

---

[3] When Montgomery made this submission, the time had already expired for her to amend as of right. Fed. R. Civ. P. 15 permits amendment once as a matter of course within (a) 21 days after service or (b) 21 days after service of a responsive pleading or 21 days after service of a Rule 12 motion, whichever is earlier. Fed. R. Civ. P. 15(a). The complaint was served on HUD on or about June 10, 2009, and HUD filed its motion to dismiss on December 2, 2009. (*See* Govt.'s Letter dated June 14, 2010 at 2 n.1.) The last day for Montgomery to amend as of right was therefore December 23, 2009.

Similarly, there is no factual basis for Montgomery's bald assertion that HUD owns MNM. Montgomery appears to rely entirely on the fact that the property is Section 8 housing, which means that HUD subsidizes her rent, not that it owns her property. Even if MNM did all that Montgomery alleges it did, there are no plausible allegations that it acted within the scope of an agency relationship with HUD.

Montgomery's other justification for suing HUD is that HUD subsidizes her rent for an apartment in poor condition. Although Montgomery doesn't say so, she presumably means that HUD bears liability for failing to enforce her landlord's obligations under Section 8 of the Housing Act of 1937 ("Housing Act"), 42 U.S.C. § 1437f, and its implementing regulations. Section 8 established various "programs to aid low-income families in obtaining decent affordable housing." *Gilchrist v. Bakshi*, No. 09-0415, 2009 WL 4909439, at *2 (D.Md. Dec. 10, 2009). The program Montgomery is a part of is the HUD Housing Choice Voucher Program ("Voucher Program"), pursuant to which HUD pays rental subsidies on behalf of eligible families. 24 C.F.R. § 982.1(a)(1).[4] The Voucher Program is administered by state or local government entities known as public housing agencies ("PHAs"). *Gilchrist*, 2009 WL 4909439, at *2 (citing 42 U.S.C. § 1437f(o)).

Section 8 housing must comply with housing quality standards ("HQS") that HUD prescribes. 42 U.S.C. § 1437f(o)(8); 24 C.F.R. § 982.401. If the owner of a Section 8 unit fails to maintain the unit in compliance with the HQS, the PHA is

---

[4] A voucher may be either "project-based" or "tenant-based." 42 U.S.C. § 1437f(o)(2); 24 C.F.R. § 982.1(b)(1). In project-based programs, subsidies are paid for "families who live in specific housing developments or units." 24 C.F.R. § 982.1(b)(1). In tenant-based programs, the family is free to select the unit. *Id.* The distinction makes no difference here. The rules regarding HUD's enforcement of housing quality standards are the same for project-based and tenant-based programs.

obligated to "take prompt and vigorous action to enforce the owner obligations."  24 C.F.R. § 982.404(2).  Construed very liberally, Montgomery's claim is that HUD failed to take action to enforce compliance with the HQS, and continued to subsidize Montgomery's dwelling unit while it was out of compliance with those standards.  Such a claim, however, is unavailable to Montgomery.

First, the Housing Act does not expressly grant a private right of action to individuals who, like Montgomery, are suing HUD over the poor quality of their Section 8 housing.  *See* 42 U.S.C. § 1437f(o)(8);[5] 24 C.F.R. § 982.401 *et seq.*; *Hill v. Richardson*,

---

[5] Section 1437f(o)(8) of the Housing Act, which is titled "Inspection of units by PHAs," provides that

> (A) In general
>
> Except as provided in paragraph (11), for each dwelling unit for which a housing assistance payment contract is established under this subsection, the public housing agency shall inspect the unit before any assistance payment is made to determine whether the dwelling unit meets the housing quality standards under subparagraph (B).
>
> (B) Housing quality standards
>
> The housing quality standards under this subparagraph are standards for safe and habitable housing established—
>
>> (i) by the Secretary for purposes of this subsection; or
>>
>> (ii) by local housing codes or by codes adopted by public housing agencies
>
> * * *
>
> (C) Inspection
>
> The determination required under subparagraph (A) shall be made by the public housing agency (or other entity, as provided in paragraph (11)) pursuant to an inspection of the dwelling unit conducted before any assistance payment is made for the unit. Inspections of dwelling units under this subparagraph shall be made before the expiration of the 15-day period beginning upon a request by the

7 F.3d 656, 658 (7th Cir. 1993) ("[Section] 1437f does not create a private right of action."); *Kirby v. Richmond Redevelopment & Housing Authority*, No. 04-0791 (REP) (MHL), 2005 WL 5864797, at \*7 (E.D.Va. Sept. 28, 2005), *aff'd*, 194 F. Appx. 105 (4th Cir. 2006) ("No express private right of action exists in [the Housing Act] or the regulations enabling a voucher participant to enforce the provisions."); *Johnson v. City of Detroit*, 319 F. Supp. 2d 756, 764 (E.D. Mich. 2004), *aff'd* 446 F.3d 614 (6th Cir. 2006) ("Nothing in [Sections 1437 and 1437f] establishes a clear and unambiguous intent by

---

resident or landlord to the public housing agency or, in the case of any public housing agency that provides assistance under this subsection on behalf of more than 1250 families, before the expiration of a reasonable period beginning upon such request. The performance of the agency in meeting the 15-day inspection deadline shall be taken into consideration in assessing the performance of the agency.

(D) Annual inspections

Each public housing agency providing assistance under this subsection (or other entity, as provided in paragraph (11)) shall make an annual inspection of each assisted dwelling unit during the term of the housing assistance payments contract for the unit to determine whether the unit is maintained in accordance with the requirements under subparagraph (A). The agency (or other entity) shall retain the records of the inspection for a reasonable time and shall make the records available upon request to the Secretary, the Inspector General for the Department of Housing and Urban Development, and any auditor conducting an audit under section 1437c(h) of this title.

(E) Inspection guidelines

The Secretary shall establish procedural guidelines and performance standards to facilitate inspections of dwelling units and conform such inspections with practices utilized in the private housing market. Such guidelines and standards shall take into consideration variations in local laws and practices of public housing agencies and shall provide flexibility to authorities appropriate to facilitate efficient provision of assistance under this subsection.

42 U.S.C. § 1437f(o)(8).

Congress to create privately enforceable rights under § 1983 to ensure compliance with housing quality standards.").

Nor can such a right be implied from Section 1437f of the Housing Act. "[T]he Supreme Court has come to view the implication of private remedies in regulatory statutes with increasing disfavor." *Hallwood Realty Partners, LP v. Gotham Partners, LP*, 286 F.3d 613, 618 (2d Cir. 2002). "An implied private right of action exists only if Congress intended to create such a right." *New York v. Atlantic States Marine Fisheries Comm'n*, 609 F.3d 524, 530 (2d Cir. 2010) (citing *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001)). Whether Congress so intended "is 'definitively answered in the negative' where a 'statute by its terms grants no private rights to any identifiable class.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–84 (2002) (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 576 (1979)). To create a private right, then, a statute "must be 'phrased in terms of the persons benefited.'" *Gonzaga*, 536 U.S. at 284 (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692 n.13 (1979)); *see Sandoval*, 532 U.S. at 289 ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'") (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)).

Title VI of the Civil Rights Act of 1964, for example, creates individual rights because its focus is unquestionably on the benefited class. *See Cannon*, 441 U.S. at 691; 42 U.S.C. § 2000d ("No person in the United States shall . . . be subjected to discrimination under any program or activity receiving Federal financial assistance" on the basis of race, color, or national origin.). Section 1437f(o)(8), by contrast, provides no reason to think that Congress intended by it to create a new private right. It does not

contain rights-creating language, and it focuses on the class of regulated persons—owners of Section 8 housing who are subject to inspections—rather than the individuals protected by the statute.  In addition, HUD regulations specifically foreclose a private right of action or private right based upon HQS violations.  *See* 24 C.F.R. § 983.101(d) ("Parts 982 and 983 of this chapter do not create any right of the family or any party, other than HUD or the PHA, to require enforcement of the HQS requirements or to assert any claim against HUD or the PHA for damages, injunction, or other relief for alleged failure to enforce the HQS."); 24 C.F.R. § 982.406 (same).  Deference is due to HUD's reasonable interpretation of the statute.  *See Wright v. City of Roanoke Redevelopment & Hous. Authority*, 479 U.S. 418, 427, 430 (1987) ("HUD's opinion as to available tenant remedies under the Housing Act is entitled to some deference by this Court."); *see also Dajour B. v. City of New York*, No. 00-2044 (JGK), 2001 WL 830674, at *8 n.7 (S.D.N.Y. July 23, 2001) ("Courts may, however, plainly consider implementing regulations in determining whether a statute creates a federal right.").

  For all these reasons, the Court joins a number of other courts in concluding that no implied right of action exists in Section 1437f(o)(8).  *See Gilchrist*, 2009 WL 4909439, at *2–*3 (holding that the Housing Act does not create a federal right of action against HUD for failing to enforce a landlord's compliance with the HQS); *Kirby*, 2005 WL 5864797, at *8; *Lindsay v. New York City Housing Authority*, No. 95-3315, 1999 WL 104599, at *4 (E.D.N.Y. Feb. 24, 1999) (stating in dicta that 24 C.F.R. § 982.406 "unambiguously denies a private right of action"); *Green v. Konover Residential Corp.*, No. 95-1984, 1997 WL 736528, at *8 (D. Conn. 1997) (finding that no private right of action exists under § 1437 "for failure to maintain the premises in a safe and sanitary

condition," because Congress's intention was that "HUD should enforce the required conditions by asserting its rights under the HAP contracts, thereby foreclosing private enforcement of the requirements under the Housing Act").

## CONCLUSION

For the reasons given above, the action is dismissed as against HUD.

SO ORDERED.

Dated: New York, New York
       September 7, 2010

*Richard J. Holwell*
United States District Judge

11